STEVE HANLE, SBN 168876
shanle@stradlinglaw.com
JASON H. ANDERSON, SBN 172087
janderson@stradlinglaw.com
IRELAND R. LARSEN, SBN 358974
ilarsen@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: 949 725 4000

Attorneys for Plaintiff
Villani, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Villani, Inc., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Dermata Therapeutics, Inc., a Delaware corporation,<br><br>Defendant. | CASE NO. 8:26-cv-00975<br><br>**PLAINTIFF VILLANI, INC.'S COMPLAINT FOR FALSE ADVERTISING (15 U.S.C. SECTION 1125(a)), BREACH OF CONTRACT, AND CONVERSION**<br><br>***ACTION SEEKING NATIONWIDE INJUNCTIVE RELIEF*** |

# COMPLAINT

Plaintiff Villani, Inc. ("**Villani**"), by and through its attorneys, and for its Complaint against Defendant Dermata Therapeutics, Inc. ("**Dermata**") hereby alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for false advertising under the Lanham Act, 15 U.S. § 1125, breach of contract, and conversion. Plaintiff Villani, Inc. seeks injunctive relief only in this case.

2. Villani was founded and is principally owned by Dr. Maria Villani, a scientist and inventor who has devoted more than 35 years to researching bioactive compounds and secondary metabolites derived from freshwater sponge (a rare variant of *Spongilla lacustris*), including any part, portion, extract, or other derivative thereof ("**Sponge**"). Dr. Villani's work led to methods for harvesting and processing Sponge into therapeutic compounds with anti-inflammatory, antibacterial, and other pharmacological properties. Dr. Villani is the named inventor on 19 patents and developed substantial proprietary know-how relating to Sponge.

3. In 2017, after extensive diligence, Dermata entered into a License Agreement to obtain exclusive rights to Villani's Patents and Know-How. In exchange, Dermata agreed to use Commercially Reasonable Efforts to obtain FDA regulatory approval and commercialize Sponge as a pharmaceutical ingredient or product for acne and other skin diseases. After Dermata twice failed to fulfill its obligations under the Agreement, the parties executed amendments to the License Agreement in 2019 and 2021.

4. Dermata filed an Investigational New Drug application ("**IND 135490**") and used Licensed Know-How to develop a new drug it called XYNGARI™ for the treatment of acne. By its own admissions, Dermata achieved extremely positive results in Phase 2 and Phase 3 clinical trials.

Dermata announced these positive Phase 3 results in March 2025, and, as late as August 2025, planned to proceed with a second FDA-required Phase 3 trial.

5. But on September 9, 2025, Dermata abruptly withdrew IND 135490, in breach of its contractual obligation to pursue regulatory approval of its new drug under the License Agreement. Based on that breach, among others, Villani terminated the Agreement, effective no later than December 15, 2025. Dermata disputes certain of the breaches alleged by Villani but agrees that the License Agreement terminated no later than February 15, 2026. The breaches alleged by Villani that seek monetary relief are the subject of an AAA arbitration, commenced concurrently with the filing of this action.

6. However, the License Agreement expressly authorizes the injunctive relief sought here. Section 12.7 provides that if certain material obligations under the Agreement are breached, "the injured Party shall be authorized and entitled to seek to obtain from any court of competent jurisdiction injunctive relief." Section 11.2 similarly carves out from AAA arbitration any proceeding "as necessary to protect either Party's name, proprietary information, trade secrets, Know-How or any other proprietary right." This Complaint is limited to causes of action seeking injunctive relief for the irreparable harm caused by Dermata's ongoing and imminent conduct alleged herein.

7. In its September 2025 press release regarding the withdrawal of IND 135490, Dermata announced a "bold strategic pivot" to commence development of over-the-counter ("**OTC**") products incorporating Sponge, under the mistaken belief that it could evade both its "regulatory burden" and its substantial milestone and royalty payment obligations to Villani under the License Agreement, despite the ongoing use of Licensed Know-How. Dermata's public statements since that time, and as of the filing of this Complaint, confirm that the Dermata OTC Products it plans to launch in "the middle of 2026"—both direct to consumers and to aestheticians and dermatologists for in-office

treatments—will incorporate Sponge and use Licensed Know-How, in breach of several provisions of the License Agreement that survived termination.[1]

8. In advance of its imminent product launch, Dermata has also engaged in a deliberate false advertising scheme to promote the imminent sale of the Dermata OTC Products through statements that mislead Sponge consumers to believe that: (a) the Dermata OTC Products possess the drug properties and pharmacological activity of the unapproved drug XYNGARI™, including a 40% reduction in inflammatory lesions; (b) the Dermata OTC Products have been the subject of successful clinical trials under IND; (c) the Dermata OTC Products will effectively treat acne with once weekly treatments; (d) the Dermata OTC Products are recognized as safe and effective for treating moderate to severe acne; and (e) the Dermata "Clearing Treatment" conforms with the FDA's OTC Acne Monograph. Dermata has also caused reputational harm to Villani by falsely claiming that the unique pharmacological activities in the Dermata OTC Products were discovered by Dermata when they were in fact discovered by Dr. Villani.

9. Under the License Agreement, Villani retained the rights to sell Cosmetic and Professional Products (non-prescription products) using its Sponge Know-How, and calls its Professional Product the "Villani Treatment." The Villani Treatment is sold as an in-office procedure under the supervision of licensed dermatologists. Dermata's false advertising scheme—which misleads consumers into believing that the Dermata OTC Products have been clinically validated, comply with the FDA's OTC Acne Monograph, and reflect Dermata's own scientific discoveries—misleads consumers and threatens imminent,

[1] The over-the-counter and in-office products described herein include the Foundational Treatment, the Clearing Treatment, any professional or in-office products and procedures incorporating Bioneedle, and any other product or procedure that contains Sponge or incorporates Licensed Know-How, are referred to herein collectively as the "Dermata OTC Products."

irreparable harm to Villani's commercial reputation, goodwill, market share and pricing position that would be difficult to quantify and for which there is no adequate remedy at law. Villani files this action to seek injunctive relief to prevent such harm from continuing.

10. Upon termination of the License Agreement, all of Dermata's rights in the data and regulatory rights related to the Licensed Product automatically transferred to Villani at no cost, by operation of § 9.5.4.3 of the Agreement. Dermata nonetheless continues to use, display, and publicly tout that data—including clinical-trial results from the STAR-1 Phase 3 trial, IND submissions, and pharmacological findings—in advertising and SEC communications concerning the Dermata OTC Products. By doing so, Dermata has substantially interfered with Villani's exclusive rights to this property and has thus converted that property.

**THE PARTIES**

11. Plaintiff Villani is a Delaware S-corporation, with its principal place of business in Newport Beach, California. Villani is the Licensor under the License Agreement.

12. Defendant Dermata is a publicly traded Delaware corporation with its principal place of business in San Diego, California. Dermata is the Licensee under the License Agreement.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over Villani's false advertising claim under 28 U.S.C. § 1331 because it arises under the Lanham Act, 15 U.S.C. § 1125(a). The Court has supplemental jurisdiction over the breach of contract and conversion claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the Lanham Act claim.

14. The Court has personal jurisdiction as Dermata is headquartered in, and its principal place of business is in, California.

15. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because: (a) a substantial part of events or omissions giving rise to the claims occurred in this District, including Villani's development of the Know-How, Villani's negotiation and execution of License Agreement and amendments, the harms alleged herein to Villani's business, and the false advertising alleged herein, which was directed at and received by consumers in this District; and (b) a substantial part of property that is the subject of the action (the Know-How owned by Villani) is situated in this District, at Villani's principal place of business in Newport Beach.

## GENERAL ALLEGATIONS

### A. The License Agreement and Amendments

16. Effective March 31, 2017, Dermata and Villani entered into a License Agreement (the "Original Agreement"), under which Villani granted Dermata an exclusive license under the Licensed Patents and Licensed Know-How to develop, seek FDA approval for, and commercialize the Licensed Product. The parties thereafter entered into a First Amendment in 2019 and a Second Amendment in 2021. The Original Agreement, as amended by the First Amendment and the Second Amendment, are collectively referred to herein as the "License Agreement" or the "Agreement." Capitalized terms herein are used in accordance with the License Agreement.

17. The Agreement includes several provisions that preclude Dermata from using Licensed Know-How outside the scope of or without the license, including after termination.

a. "Confidential Information" is defined under the Agreement to include "Licensed Know-How," and Dermata agreed "to maintain secret and confidential the Licensed Know-How and … to use the same exclusively as permitted under this Agreement," both during the term of the Agreement (§ 6.1.1) and after, "without limit in time" (§ 6.1.6).



STRADLING YOCCA CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

Further, "[u]pon the termination of this Agreement, all material information of the disclosing Party in the receiving Party's possession will be returned to the disclosing Party (or destroyed by the receiving Party, with written confirmation of such destruction), **and the receiving Party will make no further use thereof**." (§ 6.1.7)

b. "2.8 No Other Rights. All rights in and with respect to any intellectual property owned or Controlled by Licensor that are not expressly licensed, granted or assigned to Dermata under this Agreement are retained by Licensor, **and any use of the inventions claimed in the Licensed Patents, or the Licensed Know-How, except in the Exploitation of the Licensed Products is prohibited**."

18. Importantly, non-pharmaceutical, non-prescription Cosmetic Products and Professional Products incorporating Sponge were specifically excluded from the scope of the license grant to Dermata, and Villani retained the sole rights to develop and sell Cosmetic and Professional Products based on Licensed Know-How. (§ 2.6). In other words, Dermata was always and remains contractually precluded from using Licensed Know-How to develop or commercialize Cosmetic or Professional Products, as defined in the License Agreement. Villani has exercised its retained rights to commercialize its Sponge technology through the Villani Treatment, which is offered as an in-office procedure under the supervision of licensed dermatologists. These retained rights, however, were tightly constrained by the Agreement's definition of "Cosmetic Product" (§ 1) and by the conditions set forth in §§ 2.6.2, 2.6.3, 2.6.4, and 2.7, which restricted product composition, format, and permissible indications; mandated pre-launch disclosures to Dermata; and, following Dermata's Regulatory Approval, required Villani to affirmatively evidence non-effectiveness as a condition of continued commercialization.

19. The License Agreement provides, at § 12.7:

> Injunctive Relief. Licensor and Dermata agree that if certain material obligations under this Agreement are not performed in accordance with their specific terms or are otherwise breached, (a) severe and irreparable damage would occur, (b) no adequate remedy at law would exist, and (c) damages would be difficult to determine. Licensor and Dermata agrees that, in such case, the injured Party shall be authorized and entitled to seek to obtain from any court of competent jurisdiction injunctive relief, whether preliminary or permanent, as well as any other relief permitted by applicable law, and the breaching Party shall waive any requirement that such Party post bond as a condition for obtaining any such relief.

20. Section 11.2 of the License Agreement requires that Disputes be resolved by AAA arbitration, but expressly preserves this Court's jurisdiction to grant injunctive relief:

> Nothing in this Agreement shall be deemed as preventing either Party from seeking injunctive relief (or any other provisional remedy) from any court having jurisdiction over the Parties and the subject matter of the Dispute as necessary to protect either Party's name, proprietary information, trade secrets, Know-How or any other proprietary right.

21. On June 4, 2019, Dermata and Villani entered into the First Amendment, which clarified and expanded the definitions of Licensed Know-How and Licensed Product.

> 'Licensed Know-How' means any Know-How that is necessary or useful to Exploit any Licensed Product, including Improvements to the foregoing, which are owned or otherwise Controlled by Licensor


STRADLING YOCCA CARLSON & RAUTH
LAWYERS
NEWPORT BEACH
4917-9089-6030v18/014431-0020

> or any of its Affiliates as of the Effective Date or during the Term. For avoidance of doubt, all Harvest Know-How and all Regulatory Approval Know-How is Licensed Know-How. … Licensed Know-How Exploited by Dermata shall remain Licensed Know-How even if it becomes part of the public domain after the Effective Date of the Agreement."
>
> **"Licensed Product" means any pharmaceutical product for use in the Field that (i) contains Sponge, alone or in combination with other active or inactive ingredients, and (ii) incorporates or was developed using Licensed Know-How**, or that would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such Valid Claim exists…. **For avoidance of doubt, pharmaceutical products that include Sponge as an ingredient, or as part of a pharmaceutical regimen, for the enhancement or modulation of skin permeability, in combination with other ingredients are Licensed Products. For further avoidance of doubt, the products that (i) were the subject of the IND application submitted by Dermata in or about March 2018 for Acne**, (ii) were used for Dermata's hyperhidrosis study in 2019, and (iii) were otherwise in existence as of the date of this Amendment, **were developed with Licensed Know-How and are Licensed Products**. **For avoidance of doubt, any product including Sponge that is evaluated by the FDA for Regulatory Approval according to the FDA Botanical Drug Development Guidance for Industry is a Licensed Product**.

22. The First Amendment also included critical termination provisions to ensure that, if Dermata failed to fully perform or if the Agreement was terminated for any reason, Villani would be able to continue the regulatory



STRADLING YOCCA CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4917-9089-6030v18/014431-0020

pathway and commercialization of its Know-How, without having to compete with Dermata. Specifically, under §§ 9.5.4.1 and 9.5.4.3, upon termination, "all of Dermata's rights in all data, and regulatory rights, … related to Licensed Product shall automatically and without any further action by Dermata or Licensor [Villani] be transferred to Licensor at no cost to Licensor." Those rights thus automatically became Villani's exclusive property upon termination.

23. The parties entered into the Second Amendment on July 30, 2021. Its provisions addressed matters not at issue in this action.

**B. Dermata's Reliance on Licensed Know-How in Developing XYNGARI™**

24. After entering into the License Agreement, Dermata filed IND 135490 and used Licensed Know-How to develop a new drug it called XYNGARI™ for the treatment of acne. Throughout its development and regulatory efforts concerning the Licensed Product, Dermata relied heavily on Licensed Know-How. For example:

a. Villani-sourced Russian regulatory and safety documentation was cited as the primary evidence of prior safe human exposure in virtually every clinical submission, from investigator brochures to clinical study protocols and study reports.

b. Villani's reference standard (Lot DA-EB-180101) and HPLC fingerprint identification method served as the analytical foundation for all drug substance and drug product quality control throughout the IND.

c. Villani's gamma irradiation sterilization process, historical batch data, and processing methodology were adopted as the basis for Dermata's entire manufacturing workflow.

d. Dermata repeatedly disclosed to the FDA that DMT310, the subject of the IND (called XYNGARI™ when used for the treatment of acne),

was developed from Villani's Sponge and Licensed Know-How under the License Agreement.

e. Villani-provided clinical data, principally the Dr. Donna West therapeutic trial (2003), was cited as key human safety evidence supporting clinical study authorization.

25. The pharmacological activity that Dermata now publicly attributes to its own scientific research and clinical development was discovered, developed, documented, and owned by Dr. Maria Villani years before the License Agreement was signed, and is dependent on Villani's harvesting and processing methods for Sponge, defined in the License Agreement as "Harvest Know-How." Specifically, beginning in 2004, Dr. Villani commissioned a series of in-vitro studies establishing the pharmacological activity of Sponge-based compounds she perfected, including: (a) antimicrobial activity against *Propionibacterium acnes* (*C. acnes*); (b) inhibition of squalene production (lipogenesis) in sebocytes; and (c) dose-dependent inhibition of IL-8-induced human neutrophil migration with complete inhibition at a 1:50 dilution—the precise IL-8 inflammatory pathway Dermata now publicly and falsely claims as its own discovery. Each study expressly designated its results as Dr. Villani's "absolute property." These discoveries were included in Villani's Know-How licensed to Dermata solely for the purpose of developing and commercializing the Licensed Product. Dermata has no independent scientific basis for or rights to these discoveries.

26. Dermata's CEO has stated in multiple public presentations that "we measured these molecules in vitro or in test tubes" and "we found" that Spongilla's organic matter blocks IL-8 and inhibits lipogenesis in sebocytes—expressly attributing Dr. Villani's documented discoveries to Dermata's own research. Dermata has perpetuated this false attribution through commercial

advertising and promotional materials for its new OTC products, including its November 2025 presentation and January 2026 YouTube video promoting "our powder" in the Dermata OTC Products, and presenting these same pharmacological discoveries as Dermata's own scientific contributions—without any attribution to Dr. Villani. This misattribution has caused and continues to cause concrete harm to Villani's scientific reputation and goodwill: customers in the dermatological community have contacted Dr. Villani directly questioning whether she had any role in the science underlying the Dermata OTC Products.

**C. Withdrawal of IND 135490 and the "Strategic Pivot"**

27. By its own admissions through press releases and certified SEC filings, Dermata achieved extremely positive results in Phase 2 and Phase 3 clinical trials for XYNGARI™, which Dermata expressly acknowledged was a Licensed Product. Dermata announced positive Phase 3 results in March 2025, and, as late as August 2025, planned to proceed with a second FDA-required Phase 3 trial.

28. But on September 9, 2025, Dermata abruptly withdrew IND 135490, in breach of its contractual obligation to use Commercially Reasonable Efforts to develop and seek regulatory approval of XYNGARI™ under the License Agreement. Based on that breach, among others, Villani terminated the Agreement, effective no later than December 15, 2025. Dermata disputes certain of Villani's alleged breaches, but agrees that the License Agreement terminated no later than February 15, 2026. Certain of the breaches alleged by Villani are the subject of an AAA arbitration, commenced concurrently with the filing of this action. This action seeks only injunctive relief, as permitted under the License Agreement.

29. Specifically, the License Agreement provides that if certain material obligations under the Agreement are breached, "(a) severe and irreparable

damage would occur, (b) no adequate remedy at law would exist, and (c) damages would be difficult to determine. … in such case, the injured Party shall be authorized and entitled to seek to obtain from any court of competent jurisdiction injunctive relief." Among other things, the License Agreement recognizes that injunctive relief may be "necessary to protect either Party's name, proprietary information, trade secrets, Know-How or any other proprietary right."

30. In its September 2025 press release regarding the withdrawal of IND 135490, Dermata announced a "bold strategic pivot" to commence development of over-the-counter (OTC) products incorporating Sponge, under the mistaken belief that it could avoid its "regulatory burden" and its substantial milestone and royalty payment obligations to Villani, despite the continued use of Licensed Know-How in the development and advertisement of the Dermata OTC Products.

31. In announcing its withdrawal of the IND, Dermata made clear that the new OTC products that it was planning to commercialize will be based on Licensed Know-How regarding Sponge, including both Harvest Know-How and Regulatory Approval Know-How. Specifically, Dermata touted:

a. "[T]he knowledge gained while developing the Company's *Spongilla* technology";

b. "Dermata intends to leverage its knowledge in research, development, and regulatory compliance to deliver a robust portfolio of OTC product offerings";

c. "Dermata plans to initially develop a once weekly acne kit that utilizes an approved OTC monograph active ingredient along with its *Spongilla* technology";

d. "We aim to provide patients with products that are natural, by incorporating our *Spongilla* technology and know-how"; and



STRADLING YOCCA CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

e. Dr. Christopher Nardo, Dermata's Chief Development Officer, stated: "We will apply the clinical knowledge we've gained over the last ten years to design safe and effective products which are also accessible and affordable as OTC products."

32. Dermata reaffirmed this intent in its November 14, 2025 press release, in which CEO Gerry Proehl stated: "We see this as more than a product launch—it is the beginning of a new growth chapter where *we plan to leverage our deep dermatological know-how, scientific credibility, and innovative Spongilla technology to reach consumers directly*."

**D. Branding Sponge Products as "Tome" Brand and Bioneedle Delivery System**

33. On March 26, 2026, Dermata publicly announced for the first time the branded names of its planned products incorporating Licensed Know-How and Sponge. In a press release and financial report, Dermata revealed that it is launching a skincare brand called "Tome" for sale both "directly to consumers and directly to aestheticians and dermatologists for in-office treatments. The initial Tome products are: (1) the "Foundational Treatment," a once-weekly "skin renewal" treatment described as providing a "professional aesthetician feel at home," expected to launch in mid-2026; and (2) the "Clearing Treatment," an over-the-counter acne treatment, expected to launch shortly thereafter, that will also include salicylic acid.

34. Dermata also disclosed that it is developing professional-only applications utilizing its Bioneedle Delivery System ("**BDS**")—a topical delivery platform that uses Bioneedle, Dermata's new name for the existing Sponge-based ingredient based on Villani's Know-How. Dermata touts that BDS creates microchannels in the skin for the topical delivery of botulinum toxin and dermal fillers in clinical settings. Dermata uses "Bioneedle" and "BDS" interchangeably in its public communications to refer to the same

Sponge-based technology that constitutes Licensed Know-How under the Agreement. Dermata has publicly identified Bioneedle—the Sponge-based ingredient—as a "hero ingredient" in the Dermata OTC Products.

35. For its Clearing Treatment, Dermata purports to rely on the FDA's OTC Monograph M006 for Acne. An OTC monograph "establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category … is generally recognized as safe and effective (GRASE) for its intended use." FDA OTC Monographs. The OTC Acne Monograph lists salicylic acid as an active ingredient to treat acne, but, contrary to Dermata's claims: (a) salicylic acid is to be applied at least daily to treat acne—not once per week; (b) it may be claimed to treat acne, but may not be claimed to treat particular indication levels, e.g., moderate to severe acne; and (c) it is not permitted under the Monograph to be combined with other active ingredients, or with inactive ingredients unless safe in the amounts administered. OTC Acne Monograph; 21 CFR § 330.1.

36. Most recently, on April 2, 2026, Dermata announced in a press release that it will launch BDS "in the middle of 2026." Based on Dermata's public admissions, BDS incorporates Licensed Know-How, in violation of §§ 6.1 and 2.8 of the License Agreement.

> BDS is our topical treatment system that utilizes wild-harvested *Spongilla lacustris* to aid in the intradermal delivery of macromolecules, such as botulinum toxin or dermal fillers, through topical application by a professional. These macromolecules are highly effective and approved for the treatment of multiple aesthetic skin conditions, but typically must be injected, sometimes requiring numerous injections, which can be painful for consumers. **BDS works by creating millions of microchannels in the skin to allow for the**

**topical application of macromolecules allowing for streamlined application and potentially expanded uses.**

The *Spongilla lacustris* referenced in this description is Villani's "Sponge" as defined in the License Agreement.

37. Dermata first plans to launch the Foundational Treatment with BDS, followed by the Clearing Treatment, an OTC acne kit that includes BDS and salicylic acid, an OTC acne ingredient. As addressed above, the First Amendment removed any doubt that the Dermata OTC Products—each of which incorporates Bioneedle (Sponge) as an ingredient—are "Licensed Products" incorporating Licensed Know-How: "For avoidance of doubt, pharmaceutical products **that include Sponge as an ingredient, or as part of a pharmaceutical regimen, for the enhancement or modulation of skin permeability**, in combination with other ingredients are Licensed Products." (Emphasis added.) Dermata's own published statements confirm that BDS is both a product and part of a pharmaceutical regimen that includes Sponge as an ingredient for the enhancement or modulation of skin permeability. But Dermata no longer holds a license to sell these products because the License Agreement is terminated.

**E. Imminent Consumer Deception and Irreparable Harm**

38. Dermata plans to launch the Dermata OTC Products (each of which incorporates Sponge) both "directly to consumers" and "directly to aestheticians and dermatologists for in-office treatments." The Villani Treatment, by contrast, is offered only as a professional, in-office procedure administered by licensed dermatologists and skincare professionals. Dermata's planned direct-to-consumer sales of an unapproved new drug substance—marketed with false claims of clinical efficacy and monograph compliance, and without any professional supervision—place consumers at risk of deception and material consumer injury that an in-office, professionally administered procedure does

not present. Moreover, Dermata's planned sale of Sponge-containing products direct to consumers based on the false advertising described herein, presumably at a lower-price than doctor-supervised in-office treatments, will damage the market for distribution of the Villani Treatment through physicians.

39. The Dermata OTC Product will thus directly compete with the Villani Treatment as the only competitors in the market for skincare treatments incorporating Villani's Sponge. Dermata's imminent sale of products **using** Villani Know-How, accompanied by false claims of clinical efficacy, monograph compliance, and scientific innovation, will cause ongoing consumer deception in the marketplace for Sponge-based skincare and irreparable harm to Villani's commercial reputation, the goodwill associated with its name and documented scientific work, its market and pricing positions, and its ability to commercialize its Know-How through authorized partners.

## FIRST CAUSE OF ACTION

### False Advertising Under The Lanham Act, 15 U.S. § 1125.

40. Villani incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

### A. Dermata's False Advertising Scheme Following the IND Withdrawal

41. Since its "bold strategic pivot," Dermata has engaged in a coordinated false advertising scheme to promote the imminent sale of the Dermata OTC Products by misleading consumers to believe that: (a) the Dermata OTC Products possess the drug properties and pharmacological activity of the unapproved drug XYNGARI™, including a 40% reduction in inflammatory lesions; (b) the Dermata OTC Products have been the subject of successful clinical trials; (c) the Dermata OTC Products will effectively treat acne with once-weekly treatments; (d) the Dermata OTC Products are

recognized as safe and effective for treating moderate to severe acne; and (e) the Dermata Clearing Treatment conforms with the FDA's OTC Acne Monograph despite including Sponge as a second active ingredient. Dermata has also caused reputational harm to Villani by falsely claiming that the unique pharmacological activities in the Dermata OTC Products—including the anti-inflammatory inhibition of IL-8-induced neutrophil migration, antimicrobial activity against C. acnes, and inhibition of squalene production (lipogenesis) in sebocytes—were developed by Dermata, when in fact they were discovered and developed by Villani.

42. Dermata, in connection with goods to be sold in interstate commerce, has used false and misleading descriptions and representations of fact in advertising and promotional materials regarding the nature, characteristics, and qualities of the Dermata OTC Products that are marketed and imminently available for sale. Dermata's intentional and deliberate withholding of material facts—including the fact that the Sponge-based ingredient it rebranded as "Bioneedle" is the same unapproved drug substance that was the subject of the withdrawn IND 135490—also constitutes misrepresentation of the nature, characteristics, and qualities of its products and services.

43. Dermata's false and misleading advertising includes, among other things, representations that create the impression that Dermata's present product offerings incorporating Sponge (including the Dermata OTC Productsare approved by the FDA as a drug. "Any representation that creates an impression of official approval or that a drug is approved or is legally marketable because of registration or listing is misleading …." 21 CFR § 207.77.

**1. Dermata's January 21, 2026 Webinar**

44. One type of Dermata's false advertising made a false association of the Dermata OTC Products with the unapproved drug XYNGARI™. In a

webinar posted on YouTube on January 21, 2026, Dermata's CEO, Gerry Proehl, made the following statements regarding the Dermata OTC Products: "[O]ur powder … not only does it have organic matter that reduces inflammation and kills C acne bacteria, but it has these inorganic spicules … that open up these microchannels into the face, down into the dermis." This statement is literally false by necessary implication because it claims drug properties for the Dermata OTC Products that it claimed for the unapproved drug XYNGARI™, and these properties are not associated with salicylic acid or any other OTC Acne Monograph ingredient.

45. A second type of Dermata's false advertising claims that the unique pharmacological activities of Sponge discovered by Villani were discovered by Dermata. Specifically, while Proehl was making the above statements during the January 21, 2026 webinar, the slide shown below (Slide A) was displayed in the video:




***Slide A—Dermata January 21, 2026 Webinar: "Our Powder" / Spongilla multi-use slide***.

Proehl's statements are thus false because, as described above, the pharmacological activities in the right hand column that Dermata claims

regarding "our powder" were in fact discovered by Dr. Maria Villani, documented as her exclusive intellectual property beginning in 2004, and communicated and licensed to Dermata as Villani's Know-How under the License Agreement solely for the development of XYNGARI™.

46. Notably, the above slide purporting to describe Dermata's OTC products is a version of the same slide Dermata had previously used to describe its unapproved drug XYNGARI™ in a July 1, 2025 webinar, before its "bold strategic pivot" to OTC products. https://www.youtube.com/watch?v=62J2HGmN8Y0. The slide below (Slide B) demonstrates the side-by-side comparison of Dermata's before-and-after messaging:

**July 1, 2025**

**XYNGARI™**




***Slide B—Dual Mechanism of Action (XYNGARI™ and Dermata OTC Products).***

**Jan. 21, 2026**

**OTC Products**




***Slide A—Dermata's revised Sponge description for OTC marketing***.

In July 2025, when Dermata was describing the unapproved drug XYNGARI™, it described the active Sponge ingredient as "optimized for clinical applications." In describing the Sponge in the Dermata OTC Products in January 2026, Dermata subtly and misleadingly changed the slide to add that Sponge "can be used across medical and aesthetic skin conditions" and is "optimized for skin care." Dermata thus changed the slide to suggest Sponge would not be an active ingredient, but then simultaneously claimed the same pharmacological activity as it had claimed for the unapproved drug XYNGARI™. This shows

another attempt by Dermata to claim drug properties for a purported inactive ingredient in the Dermata OTC Products.

47. Dermata also falsely advertised the Phase 3 STAR-1 clinical trial results as evidence of the efficacy of the Dermata OTC Products. During the same January 21, 2026 webinar, Proehl stated: "And again, this is a once a week treatment. … You can see here, I'll just point out, on, week four, so that's after four applications, it's over a 40% reduction in those big bright red inflammatory lesions. You're not going to see that **with any other OTC product**." These statements are false because, when Proehl made them, the video displayed the slide below (Slide C), which shows the results, not for any Dermata OTC Product, but from Dermata's Phase 3 STAR-1 clinical trial for the unapproved new drug XYNGARI™:



***Slide C — STAR-1 Phase 3 lesion-count reduction data for XYNGARI™.***

48. Dermata used quantitative efficacy data for an unapproved *drug* (40% reduction in inflammatory lesions), to compare the Dermata OTC Products to other OTC products and to assert superiority over them. Even the moderator of the webinar was deceived into believing that the above results for

an unapproved new drug can be achieved with a once-per-week OTC treatment: "I mean, the efficacy alone, I mean and the ability to do it only once per week. I think those are significant game changers in the existing standard of care for acne."

49. Dermata also falsely advertised that its OTC Products were deemed effective for treating "moderate to severe" acne. Proehl stated: "[W]e're gonna really help a lot of kids and young adults that have pretty moderate to severe acne clear their acne." This statement is false and misleading, because it claims that the Dermata OTC Products are effective for the same indication severity ("moderate to severe acne") studied in the STAR-1 Phase 3 clinical trial for the unapproved drug XYNGARI™, while claims to treat such indication severities are not permitted under the OTC Acne Monograph.

### 2. Dermata's Press Releases

50. Dermata also falsely claims that Sponge will be an inactive ingredient in the Dermata OTC Products, while at the same time claiming prescription-like results and pharmacological mechanisms of action. Dermata's March 5, 2026 press release—which it reposted on its LinkedIn page—states: "We plan to offer products that are studied by dermatologists but accessible to consumers **without the need for a prescription**. We intend to prioritize products with natural and safe ingredients that deliver prescription-like results." But the Dermata OTC Products include the same Sponge ingredient that Dermata had proposed as a new drug which, if approved, would **only be available with a prescription**. Sponge is not an inactive ingredient in the Dermata OTC Product because (a) Dermata is claiming the same pharmacological activity it claimed for the proposed new drug XYNGARI™, and (b) that pharmacological activity is not associated with salicylic acid under the OTC Acne Monograph.

51. Dermata also claims in the March 5, 2026 press release that its OTC Sponge products will address "the root causes of skin diseases and conditions," and offer a "once-weekly treatment, targeting acne." These claims are also false because they are not permitted by the OTC Acne Monograph.

52. Dermata's March 26, 2026 press release again falsely associated the Dermata OTC Products with the unapproved drug XYNGARI™ and the Phase 3 STAR-1 trial. Specifically, Dermata restated that XYNGARI™ had achieved statistically significant results in the Phase 3 STAR-1 clinical trial for the treatment of acne after just four weeks based on *once-weekly* treatments. In the very next paragraph, Dermata announced its new OTC skincare brand "Tome" and characterized the very same product as its *once-weekly* "Foundational Treatment" for "skin renewal"—without disclosing that the product contains an unapproved drug substance. Dermata then announced the imminent launch of its "Clearing Treatment" as an OTC treatment for acne—again without disclosing that it incorporates an unapproved drug substance—using the OTC Acne Monograph as a pretext to sell an unapproved drug to treat acne.

### 3. Dermata's Website and LinkedIn Pages

53. Dermata's website states:

> We are a clinical-stage biotechnology company founded in 2014 focused on developing and commercializing products for the treatment of various skin disease and multiple aesthetic skin conditions. Our current product pipeline is comprised of topical treatment product candidates derived from our Spongilla platform technology which we believe have the potential to address the multiple facets of acne, psoriasis, hyperhidrosis, and multiple aesthetic areas.
>
> Our lead product candidate, DMT310, is currently in development for the once-weekly treatment of moderate-to-severe acne.



STRADLING YOCCA CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

54. The statement that Dermata is a clinical-stage biotechnology company is literally false because "clinical-stage" means Dermata is conducting clinical trials in pursuit of FDA approval, which it has abandoned. The statements that its Spongilla products (which are OTC) treat "skin disease" and have the potential to address acne, psoriasis and hyperhidrosis are all false drug claims associated with the unapproved drug XYNGARI™ (a/k/a DMT310). And as described above, the claim that any product currently in development will treat moderate to severe acne with once-weekly treatments is false, and cannot be justified by combining Spongilla with any OTC Acne Monograph ingredients.

55. Dermata's website homepage similarly describes Dermata OTC Products as "scientifically backed over-the-count [sic] (OTC) pharmaceutical products." And the Company's pipeline page lists Acne, Psoriasis, and Seborrheic Dermatitis as product "indications," diseases Dermata intends to treat using the same unapproved drug substance—under the guise of OTC monograph products—while making the same efficacy and mechanism claims it made for the unapproved drug XYNGARI™.

56. Dermata's website also includes the November 2025 presentation described above, characterizing its acne kit with Sponge as a "once-weekly acne kit" that "may begin to reduce inflammatory lesions after only one treatment." This is a false drug efficacy claim for a product that has never been tested in any adequate and well-controlled clinical trial in its intended OTC formulation and that may not be claimed for salicylic acid, the only announced active ingredient in Dermata OTC Products.

57. The November 2025 presentation on Dermata's website also makes claims regarding Spongilla akin to medical device claims, though Spongilla has never been investigated or approved as a medical device. Dermata describes Spongilla as a "Mechanical Component" that "exfoliate[s] the dermal

epithelium"—a literally false characterization. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding. 21 C.F.R. § 807.97. Spongilla does not exfoliate. Its silica spicules micro-perforate the stratum corneum, remain lodged in living tissue for up to five days, and trigger an acute inflammatory cascade involving fibroblast activation, collagen synthesis, and dermal remodeling—and, when coated with active ingredients, provide a sustained drug-delivery depot effect directly into the viable epidermis. Dermata's own SEC filings acknowledge these pharmacological effects. By characterizing these drug effects as mechanical exfoliation, Dermata misleads consumers about the fundamental nature of the substance they are applying to their skin, while deliberately withholding the material fact that Spongilla is an unapproved drug substance for which FDA approval was sought and not obtained. Spongilla functions as a drug—it penetrates living tissue, triggers biological responses, and delivers active compounds into the skin—not as a simple physical exfoliant.

58. As of April 13, 2026, Dermata's LinkedIn page also falsely describes Dermata as "a clinical-stage biotechnology company focusing on the treatment of medical and aesthetic skin conditions" and falsely touts the unapproved drug DMT310 as the "Company's lead product candidate," even though Dermata's license as to that product has been terminated. Dermata LinkedIn. The continued promotion of the unapproved drug DMT310 and Dermata's clinical trials on the LinkedIn page is no accident. After withdrawing the IND in September 2025 and the termination of the License Agreement, and as recently as March 5, 2026, Dermata has promoted the Dermata OTC Products it plans to sell under the brand name Tome, including a link to the Yahoo Finance version of its false and misleading March 5, 2026 press release. Dermata Tome Post.

**B. Materiality, Consumer Deception, and Injury to Villani**

59. Dermata's statements and omissions are material and have the tendency to influence and deceive consumers contemplating the purchase of the Dermata OTC Products. They create the false impression that: (a) the Dermata OTC Products have the drug properties and pharmacological activity of the unapproved drug XYNGARI™, including a 40% reduction in inflammatory lesions; (b) the Dermata OTC Products have been the subject of successful clinical trials; (c) the Dermata OTC Products will effectively treat acne with once weekly treatments; (d) the Dermata OTC Products are recognized as safe and effective for treating moderate to severe acne; and (e) the Dermata Clearing Treatment conforms with the FDA's OTC Acne Monograph (despite including unapproved drug substance). Dermata has also caused reputational harm to Villani by falsely claiming that the unique pharmacological activities in the Dermata OTC Products—including the anti-inflammatory inhibition of IL-8-induced neutrophil migration, antimicrobial activity against C. acnes, and inhibition of squalene production (lipogenesis) in sebocytes—were discovered by Dermata, when they were in fact discovered by Villani. These false impressions are likely to cause consumers to purchase an unapproved new drug substance in the mistaken belief that it has been clinically validated, is monograph-compliant, and reflects Dermata's own scientific research—thereby deceiving the consuming public and misappropriating the scientific credibility of Villani's documented work.

60. Dermata's numerous and repeated improper activities, including the material misrepresentations and omissions, were intentional, willful and deliberate, reflecting a coordinated plan to mislead consumers to believe that the Dermata OTC Products have been deemed effective to treat acne and other skin conditions and/or that they do not require FDA approval, despite their inclusion of an ingredient that was, and is, an unapproved new drug.

**C. Injury, Irreparable Harm, and Entitlement to Injunctive Relief**

61. Dermata's false and misleading representations are deceiving consumers in the marketplace for non-prescription skincare and deceiving members of the dermatological community who rely on accurate attribution of scientific research. Consumers are being misled to believe that the Dermata OTC Products have been clinically validated, comply with the FDA's OTC Acne Monograph, and reflect Dermata's own scientific discoveries—none of which is true. As a direct and proximate result, Villani has suffered and will continue to suffer irreparable injury that cannot be quantified, including: (a) injury to Villani's commercial reputation and to the goodwill associated with its name and its documented scientific work; (b) actual confusion among members of the dermatological community—evidenced by inquiries directed to Villani's founder concerning her contributions to the science underlying the Dermata OTC Products; and (c) impairment of Villani's ability to commercialize its Know-How through authorized partners.

62. The deception and injuries alleged herein are ongoing and imminent. They cannot be adequately compensated in money damages and will continue unless Dermata's conduct is preliminarily and permanently enjoined. The ongoing and imminent deception of the consuming public, together with the concurrent irreparable injury to Villani's commercial reputation and goodwill, cannot be adequately compensated in money damages. The injuries alleged herein will continue unless Dermata's conduct is preliminarily and permanently enjoined.

## SECOND CAUSE OF ACTION

### Breach of Contract

63. Villani incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

64. The License Agreement, as amended by the First Amendment and the Second Amendment is a valid and binding written contract.

65. "Confidential Information" is defined under the Agreement to include "Licensed Know-How." Dermata agreed "to maintain secret and confidential the Licensed Know-How and … to use the same exclusively as permitted under this Agreement," both during the term (§ 6.1.1) and after "without limit in time" (§ 6.1.6). Further, "[u]pon the termination of this Agreement, all material information of the disclosing Party in the receiving Party's possession will be returned to the disclosing Party (or destroyed by the receiving Party, with written confirmation of such destruction), and the receiving Party will make no further use thereof." (§ 6.1.7). Section 2.8 likewise provides that "any use of the … Licensed Know-How, except in the Exploitation of the Licensed Products is prohibited." All Article 6 provisions are also listed as surviving termination. (§ 9.7).

66. Villani has fully or substantially complied with each of its obligations under the License Agreement, except as such performance has been excused by Dermata's conduct as alleged herein.

67. As more fully described above, Dermata has breached the License Agreement by impermissibly using Licensed Know-How after termination to develop the Dermata OTC Products it plans to sell imminently, which "include Sponge as an ingredient, or as part of a pharmaceutical regimen, for the enhancement or modulation of skin permeability".

68. As a direct and proximate result of such breach, Villani has suffered or will imminently suffer irreparable harm. Dermata's unauthorized use of Licensed Know-How to develop and imminently offer for sale the Dermata OTC Products—accompanied by public claims of credit for Villani's documented scientific discoveries—deceives the consuming public and the dermatological community and damages the commercial reputation and

goodwill associated with Villani's name in ways that cannot be quantified. Monetary damages are inadequate to redress that ongoing and irreparable harm, the continuing misappropriation of Villani's Know-How, and the dilution of the value of decades of proprietary scientific work. That inadequacy is particularly acute given that Dermata held the exclusive pharmaceutical license to Sponge for nearly nine years and, during that period, imposed significant contractual constraints on Villani's retained Cosmetic and Professional Products rights—constraints Dermata itself now disregards as it enters the same non-prescription channel using Villani Know-How. Section 11.2 of the License Agreement expressly recognizes protection of Villani's Know-How as justifying injunctive relief. If Dermata is not enjoined, it will be unjustly enriched through commercializing the Dermata OTC Products in the very channels the License Agreement reserved to Villani and its authorized partners.

69. The injunctive relief sought herein is expressly authorized under §§ 11.2 and 12.7 of the License Agreement and is independent from the relief sought in the co-pending AAA arbitration.

## <u>THIRD CAUSE OF ACTION</u>

### Conversion

70. Villani incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

71. The License Agreement provides that, upon termination, "all of Dermata's rights in all data and regulatory rights related to Licensed Product shall automatically and without any further action by Dermata or Licensor [Villani] be transferred to Licensor at no cost to Licensor." (§ 9.5.4.3). The License Agreement is terminated, and Villani thus has the sole and exclusive ownership and right to possession of the data and regulatory rights related to the Licensed Product, including, including without limitation: (a) the data generated by the Phase 2b study and the Phase 3 STAR-1 clinical trial; (b) the IND filing

and all submissions under IND 135490; (c) Chemistry, Manufacturing, and Controls ("**CMC**") data; (d) investigator's brochures; (e) clinical study reports and protocols; (f) bioanalytical and batch release data; and (g) any other data generated using Licensed Know-How in connection with Regulatory Approval (collectively, the "Sponge Regulatory Data").

72. Villani owns the Sponge Regulatory Data and is entitled to its exclusive possession and control. Intangible electronic data of this kind is convertible under California law. *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003).

73. Without Villani's consent, and after termination of the License Agreement, Dermata has and continues to use the Sponge Regulatory Data, substantially interfering with Villani's right to exclusive rights to such Data. Dermata has used, displayed, and publicly touted the Sponge Regulatory Data for its own benefit in advertising and corporate communications, including the March 26, 2026 press release, the January 21, 2026 webinar, the November 2025 investor presentation, and the Dermata website and LinkedIn pages.

74. As a direct and proximate result of Dermata's continuing conversion of the Sponge Regulatory Data, Villani has suffered and will continue to suffer irreparable harm absent injunctive relief. The continuing dilution of Villani's exclusive rights in the Sponge Regulatory Data, the continuing public misuse of that data in advertising that misleads consumers and the dermatological community, and the continuing impairment of Villani's ability to commercialize its Know-How through authorized partners justify the equitable relief requested herein and cannot adequately be remedied by money damages alone.

75. Such monetary damages caused by Dermata's conversion are reserved for the concurrently-filed AAA arbitration pursuant to § 12.7 of the License Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Villani, Inc. respectfully prays for judgment against Defendant Dermata Therapeutics, Inc. as follows:

A. An order, pursuant to Federal Rule of Civil Procedure 65, preliminarily and permanently enjoining Dermata, its officers, directors, employees, agents, and all persons in active concert or participation with them (collectively, "Dermata and Related Persons"), from disseminating in commerce any advertising, marketing, promotional, investor, or consumer-facing communication—including on dermatatx.com, Dermata's social-media accounts, in press releases, investor presentations, SEC filings, YouTube videos, and professional-channel materials—that:

A.1. represents, directly or by implication, that any Dermata OTC Product (as defined in this Complaint, including any product incorporating Bioneedle or BDS) possesses the drug properties, pharmacological activity, or efficacy of XYNGARI™ or DMT310, including any reduction in inflammatory-lesion counts;

A.2. represents, directly or by implication, that any Dermata OTC Product has been the subject of clinical trials or is supported by the results of the Phase 2b study, the Phase 3 STAR-1 trial, or any other study conducted under IND 135490;

A.3. represents, directly or by implication, that any Dermata OTC Product will effectively treat acne with once-weekly treatments, or that any Dermata OTC Product is recognized as safe and effective for treating moderate to severe acne;

A.4. represents, directly or by implication, that the Dermata Clearing Treatment (or any other Dermata OTC Product) conforms with the FDA's OTC Acne Monograph despite including Sponge, an unapproved drug substance; and

A.5. represents, directly or by implication, that the unique pharmacological activities in the Dermata OTC Products—including the anti-inflammatory inhibition of IL-8-induced neutrophil migration, antimicrobial activity against C. acnes, and inhibition of squalene production (lipogenesis) in sebocytes—were developed or discovered by Dermata, when in fact they were discovered and developed by Villani.

B. An order, pursuant to Federal Rule of Civil Procedure 65, preliminarily and permanently enjoining Dermata and Related Persons from developing, manufacturing, promoting, marketing, using, selling, offering for sale, distributing, or delivering in commerce any product or regimen that contains or incorporates Licensed Know-How or Sponge, including without limitation:

B.1. the Dermata OTC Products, as defined in this Complaint;

B.2. the products that were the subject of IND 135490, and the Sponge components thereof;

B.3. any product that (i) contains Sponge, alone or in combination with other active or inactive ingredients, and (ii) incorporates or was developed using Licensed Know-How; and

B.4. any product that includes Sponge as an ingredient, or as part of a pharmaceutical regimen, for the enhancement or modulation of skin permeability, in combination with other ingredients.

C. An order, pursuant to Federal Rule of Civil Procedure 65, preliminarily and permanently enjoining Dermata and Related Persons from publishing, using, displaying, distributing, or otherwise relying on the Sponge Regulatory Data (as defined in this Complaint), in violation of Villani's exclusive rights to such Data.

D. An award of Villani's costs of suit, and, to the extent permitted by law and contract, reasonable attorneys' fees, including under 15 U.S.C. § 1117(a) upon a finding that this is an "exceptional case."

E. Such other and further relief as the Court may deem just and proper.

DATED: April 23, 2026

STRADLING YOCCA CARLSON & RAUTH LLP

By: */s/ Steve Hanle*

Steve Hanle
Jason H. Anderson
Ireland R. Larsen

Attorneys for Plaintiff Villani, Inc.